EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Super Asphalt Pavement, Corp.<br><br>Peticionario<br><br>v.<br><br>Autoridad para el Financiamiento de la Infraestructura de Puerto Rico<br><br>Recurrido<br><br>A&M Group, Inc.<br><br>Recurrido | Certiorari<br><br>2021 TSPR 45<br><br>206 DPR \_\_\_\_ |

Número del Caso: CC-2019-130

Fecha: 30 de marzo de 2021

Tribunal de Apelaciones:

      Región Judicial de San Juan

Abogada de la parte peticionaria:

      Lcda. Sonia S. Sierra Sepúlveda

Abogado de la parte recurrida:

      Lcdo. Luis R. Ortiz Segura

Materia: Derecho Administrativo: Evaluación sobre la *Ley para la Inversión de la Industria Puertorriqueña* y su efecto en los procesos de subastas gubernamentales. Específicamente, la aplicación sobre el parámetro de preferencia a los productores puertorriqueños al momento de adjudicar la subasta cuando el presupuesto disponible para el proyecto es menor que la propuesta recibida.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Super Asphalt Pavement, Corp.<br><br>Peticionario<br><br>v.<br><br>Autoridad para el Financiamiento de la Infraestructura de Puerto Rico<br><br>Recurrido<br><br>A&M Group, Inc.<br><br>Recurrido | CC-2019-0130 | *Certiorari* |

**El Juez Asociado señor RIVERA GARCÍA emitió la Opinión del Tribunal.**

En San Juan, Puerto Rico, a 30 de marzo de 2021.

En esta ocasión nos corresponde evaluar las disposiciones de la Ley para la Inversión de la Industria Puertorriqueña, *infra*, y su efecto en los procesos de subastas gubernamentales. Específicamente, la controversia ante nuestra consideración trata sobre cómo aplica el parámetro de preferencia a los productores puertorriqueños al momento de adjudicar la subasta cuando el presupuesto disponible para el proyecto es menor que la propuesta recibida.

A continuación, esbozamos los antecedentes fácticos pertinentes al caso de autos.

I

El 29 de junio de 2018 la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (AFI)

publicó un aviso de subasta pública para el proyecto AFI-BP-18-18 sobre "Repaving of the State Road PR-335 and its Branch PR-3334 at the Municipality of Yauco". A esos fines, AFI notificó a los licitadores sobre su obligación de cumplir con los requisitos establecidos en los pliegos de subasta. Para ello, les entregó las instrucciones (*Instruction to Proponents*), las cuales establecían, entre otras cosas, que para poder reclamar el beneficio dispuesto en la Ley Núm. 14-2004, conocida como *Ley para la Inversión en la Industria Puertorriqueña*, el licitador tenía que incluir en la propuesta una copia de la resolución emitida por la Junta de Preferencia. A su vez, el licitador debía establecer el por ciento de preferencia otorgado al producto que se ofrece en la propuesta. El 31 de julio de 2018, fecha límite para la entrega de propuestas, AFI recibió cuatro propuestas de licitadores, las cuales quedaron de la forma siguiente:[1]

| # | Licitadores | Hora Entrega | Propuesta | Porciento de Preferencia | Propuesta Ajustada |
|---|---|---|---|---|---|
| 1 | Super Asphalt Pavement, Corp. | 9:15 am | $929,703 | 10%=>($56,795.20) | $872,907.80 |
| 2 | A&M Group, Inc. | 9:30 am | $889,700 | 0% | $889,700 |
| 3 | Nieves & Nieves Engineers & Contractors, Inc. | 9:35 am | $1,104,598 | 0% | $1,104,598 |
| 4 | Transporte Rodríguez Asfalto, Inc. | 9:40 am | $1,483,937 | 15%=>($149,087.40) | $1,334,849.60 |

---

[1] Apéndice de la Petición de *certiorari*, pág. 158.

Así las cosas, el Departamento de Subastas llevó a cabo el análisis del cumplimiento de las propuestas recibidas conforme a los criterios mínimos establecidos en las instrucciones al licitador y su respectiva *Adenda*. De este análisis resultó que todos los participantes con las propuestas más bajas excedían el presupuesto disponible.[2] Por tal razón, conforme establece el Artículo 8.2 del Reglamento de Compras y Subastas de AFI, el 10 de agosto de 2018 se notificó la cancelación del proceso de subasta del referido proyecto. Cabe resaltar que del aviso de cancelación surge que a dos de los licitadores se les aplicó el por ciento de preferencia a tenor con la Ley Núm. 14-2004, entre ellos, Super Asphalt Pavement, Corp. (Super Asphalt o peticionario).[3]

Así las cosas, la Junta de Subastas autorizó negociar con los dos licitadores que sometieron las propuestas más bajas, en pro de los mejores intereses de AFI, para lograr la ejecución de la obra dentro de los parámetros del presupuesto asignado. Los licitadores con las propuestas más bajas fueron A&M Group, Inc. (A&M o recurrido) y Super Asphalt. El 17 de agosto de 2018 se llevó a cabo una reunión de negociación con ambos licitadores, a quienes se les solicitó entregar, en los próximos diez días, una oferta revisada. Así las cosas, el 27 de agosto de 2018 se realizó la apertura de las ofertas revisadas. La siguiente

---

[2] Véase *Notificación de cancelación*, apéndice de la Petición de *certiorari*, pág. 159.

[3] Íd., págs. 158-159.

tabla detalla las propuestas en el orden en que fueron recibidas:[4]

| No. Propuesta | Hora Recibida | Nombre de la Compañía | "Best and Final Offer" |
|---|---|---|---|
| 1 | 10:01 am | A&M Group, Inc. | $849,285.00 |
| 2 | 10:01 am | Super Asphalt Pavement, Corp. | $901,305.40 |

Posteriormente, el Departamento de Ingeniería ajustó la partida de "ALLOWANCE" estableciendo una reducción de $70,000 a los dos licitadores. La siguiente tabla detalla el ajuste realizado en las propuestas recibidas:[5]

| No. Propuesta | Nombre de la Compañía | "Best and Final Offer" | Ajuste "Allowance" | Final Offer |
|---|---|---|---|---|
| 1 | A&M Group, Inc. | $849,285.00 | ($70,000.00) | $779,285.00 |
| 2 | Super Asphalt Pavement, Corp. | $901,305.40 | ($70,000.00) | $831,305.40 |

A base de ello, el 13 de septiembre de 2018 AFI emitió una *Notificación de Adjudicación de Subasta* en la cual le otorgó la buena pro a la recurrida. La Junta de Subastas sostuvo que la compañía A&M presentó la propuesta del "Best and Final Offer" menor y estaba dentro de los parámetros del presupuesto asignado por $779,285.

Inconforme, el 2 de octubre de 2018 Super Asphalt presentó una *Moción de Reconsideración* en la cual alegó

---

[4] Apéndice de la Petición de *certiorari*, pág. 164.

[5] Íd.

que la Junta de Subastas no tomó en consideración el diez por ciento de preferencia otorgado por la Junta de Inversión en la Industria Puertorriqueña (JIIP). Arguyó que, de habérsele aplicado el por ciento de preferencia que le correspondía, este hubiese resultado ser la propuesta más baja. A raíz de ello, solicitó la reconsideración de la adjudicación de la subasta y que se determinara que era el licitador agraciado, por ser el postor con el precio final ofertado más bajo.

El 10 de octubre de 2018 AFI emitió una *Resolución* en la cual declaró no ha lugar la moción de reconsideración presentada por Super Asphalt. En lo pertinente, la Junta de Subastas indicó en su *Resolución* lo siguiente:

> 4. La propuesta de SAPC en la cantidad de $831,305.40, de aplicársele el por ciento de preferencia al cotizado a la hora de determinar el postor más bajo, no hubiese resultado en una propuesta dentro del presupuesto disponible establecido previo al iniciar el proceso establecido por la AFI, para la adjudicación de la obra de construcción.
>
> El por ciento de preferencia reconocido por el Reglamento 6825 de la Ley 14 del 2004 opera como un incentivo al licitador que reúne unos requisitos para dicho por ciento, pero de igual forma, no le puede perjudicar ni penalizar a éste luego de ser el licitador agraciado y que esté obligado a deducir la cantidad a contratar en la misma proporción del porciento de preferencia.
>
> CONCLUSIÓN:
>
> El expediente de subasta respalda, que de las dos propuestas recibidas por parte de A&M Group, Inc. y SAPC, respectivamente, solo la A&M Group, Inc. queda dentro del presupuesto de construcción previamente autorizado por la División de Finanzas de la AFI.    La

aplicabilidad del descuento de un 10% de preferencia autorizado por la Junta para la Inversión de la Industria Puertorriqueña a la propuesta de Super Asphalt Pavement Corporation, **no menoscaba la determinación de la Junta de Subasta en reconciliación con el expediente, que, a pesar de la aplicabilidad del porciento de preferencia, su precio contractual y el cual la AFI estaría obligado a desembolsar, resulta mayor al presupuesto asignado y disponible.**

Los señalamientos traídos a nuestra atención en el recurso de reconsideración por parte de SACP, no quedan respaldados por el expediente de subastas y no los hace acreedor a un remedio conforme a lo solicitado y ante el ordenamiento aplicable. El expediente solo respalda que la única propuesta recibida conforme a los parámetros y requisitos establecidos del presupuesto asignado, lo es la de A&M Group, Inc. (Énfasis en el original).[6]

Inconforme, Super Asphalt acudió al Tribunal de Apelaciones. Sostuvo que la Junta de Subastas erró al determinar no aplicar el porciento de preferencia que le fue otorgado por la JIIP, al momento de la adjudicación de la subasta.

Consecuentemente, mediante sentencia de 13 de diciembre de 2018 el foro apelativo intermedio confirmó la adjudicación de la subasta impugnada. Concluyó que la propuesta presentada por Super Asphalt de $831,305.40, de aplicársele el por ciento de preferencia al cotizado a la hora de determinar el postor más bajo, no hubiese resultado en una propuesta dentro del presupuesto disponible. Igualmente, determinó que no hay nada en la Ley Núm. 14-2004 ni en el Reglamento Núm. 8488 que obligue

---

[6] Íd., págs. 77 y 78.

a la agencia o corporación pública a adjudicar un contrato por una subasta en una cantidad que no esté disponible o no esté presupuestada como en este caso.

Oportunamente, Super Asphalt presentó una Petición de *certiorari* ante este Tribunal, en la cual imputó el error siguiente:

> Erró el Honorable Tribunal de Apelaciones al avalar la actuación de AFI de no tomar en consideración el parámetro de preferencia otorgado a Super Asphalt por virtud de la Ley Núm. 14-2004 al momento de adjudicar la subasta objeto de impugnación.[7]

El peticionario alegó, en síntesis, que no se cumple con la Ley Núm. 14-2004 y el Reglamento 6825 al aplicar el por ciento de preferencia solo para considerar aquellos licitadores que pueden presentar un "Best and Final Offer". Arguyó que tanto la ley como el reglamento antes citado le exigen a la agencia el aplicar dicho por ciento al momento de la adjudicación y que esto no ocurrió en este caso. Además, alegó que ni la Ley Núm. 14-2004 ni el Reglamento 6825 reconocen una excepción a su aplicación basada en que el monto a pagar excede el presupuesto asignado. Añadió que el presupuesto nunca fue un criterio de evaluación establecido en los pliegos de subasta.

Por su parte, el recurrido adujo que ni la Ley Núm. 14-2004 ni el Reglamento 6825 en sus disposiciones obligan a una agencia o corporación pública a adjudicar un contrato por una subasta en una cantidad que no esté

---

[7] Petición de *certiorari*, pág. 6.

presupuestada. Alegó que proveerle a los licitadores el precio presupuestado derrotaría el propósito de las subastas porque estos licitarían por esa cantidad. Además, arguyó que en la primera notificación de adjudicación se notificó que ninguno de los proponentes iniciales había cumplido con el presupuesto aprobado. Por último, levantó una alegación de **academicidad**, ya que al 31 de marzo de 2019 se habían pagado $689,285.00, que corresponde al noventa por ciento de la obra, la cual fue reportada como completada, solamente quedando pendiente unos trabajos de repavimentación.

Habiendo expedido el recurso de *certiorari* solicitado y tras examinar el expediente de autos, procedemos a resolver.

## II

### A. La doctrina de academicidad

Conforme al principio de justiciabilidad, los tribunales limitan su intervención a resolver controversias reales y definidas que afectan las relaciones jurídicas de partes antagónicas u opuestas.[8] Por lo tanto, una controversia no se considera justiciable cuando: "(1) se procura resolver una cuestión política; (2) una de las partes carece de legitimación activa; **(3) hechos posteriores al comienzo del pleito han tornado la controversia en académica;** (4) las partes están tratando de obtener una opinión consultiva, o (5) se intenta

---

[8] *UPR v. Laborde Torres*, 180 DPR 253, 279-280 (2010); *E.L.A. v. Aguayo*, 80 D.P.R. 552, 584 (1958).

promover un pleito que no está maduro". (Énfasis suplido).[9] Estos son requisitos de origen constitucional que los tribunales deben evaluar antes de considerar y pronunciarse sobre los méritos de una controversia.[10] Ello deriva del hecho de que los tribunales solamente pueden evaluar aquellos casos que sean justiciables.[11]

La doctrina de la academicidad constituye una de las manifestaciones de la justiciabilidad.[12] El propósito de este precepto es evitar el inadecuado uso de los recursos judiciales y evitar precedentes innecesarios.[13] Este Tribunal ha resuelto que un caso es académico cuando "se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes de que éste haya sido reclamado o una sentencia sobre un asunto, que al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente".[14] Asimismo, una controversia que en sus inicios era justiciable se convierte en académica

---

[9] *Bhatia Gautier v. Gobernador,* 199 DPR 59, 68-69 (2017), citando a *Asoc. Fotoperiodistas v. Rivera Schatz,* 180 DPR 920, 932 (2011) y a *Noriega v. Hernández Colón,* 135 DPR 406, 421-422 (1994).

[10] *PNP en Humacao v. Carrasquillo*, 166 DPR 70, 74 (2005).

[11] *Moreno v. Pres. U.P.R. II*, 178 DPR 969, 972 (2010); *Lozada Tirado et al. v. Testigos Jehová*, 177 DPR 893 (2010); *E.L.A. v. Aguayo*, 80 DPR 552 (1958).

[12] *CEE v. Dpto. de Estado*, 134 DPR 927, 934 (1993). Véase, además: *E.L.A. v. Aguayo*, supra; Nogueras v. Hernández Colón, 127 DPR 638 (1991); Asoc. de Periodistas v. González, 127 DPR 704 (1991); Berberena v. Echegoyen, 128 DPR 864 (1991); El Vocero v. Junta de Planificación, 121 DPR 115 (1988); Noriega v. Gobernador, 122 DPR 650 (1988); *Com. Asuntos de la Mujer v. Srio. de Justicia*, 109 DPR 715 (1980).

[13] *Empresas Puertorriqueñas de Desarrollo, Inc. v. Hermandad Independiente*, 150 DPR 924, 936 (2000).

[14] *Amador Roberts v. ELA*, 191 DPR 268, 282-283 (2014); *San Gerónimo Caribe Project v. A.R.Pe.*, 174 DPR 640, 652 (2008).

cuando "los cambios fácticos o judiciales acaecidos durante el trámite judicial de una controversia, tornan en académica o ficticia su solución".[15] Así, se debe evaluar los eventos anteriores, próximos y futuros, a fines de determinar si la controversia entre las partes sigue viva y subsiste con el tiempo.[16] Cuando un tribunal determine que un caso es académico, su deber es abstenerse de considerar los méritos de ese caso.[17]

Ahora bien, en el caso de los procesos de subastas gubernamentales, este Tribunal ha tenido la oportunidad de expresarse en torno a la doctrina de la academicidad cuando la adjudicación de una subasta fue impugnada, pero la obra ya fue completada. Particularmente, en *RBR Construction, S.E. v. Autoridad de Carreteras y Transportación*, 149 DPR 836 (1999), resolvimos que la adjudicación del proyecto no es el único remedio al cual se podría tener derecho en estos casos. En síntesis, RBR Construction (RBR) compareció junto a otros licitadores a una subasta convocada por la Junta de la Autoridad de Carreteras y Transportación de Puerto Rico (Junta). La Junta rechazó la licitación de RBR debido a un problema con su seguro de fianza. Inconforme, RBR solicitó la reconsideración de la determinación. Posteriormente, la Junta anuló la subasta sin expresar las razones, celebró una nueva subasta y la adjudicó a un nuevo licitador. Ante

---

[15] *Amador Roberts v. ELA*, supra, pág. 283.

[16] Pres. del Senado, 148 DPR 737, 769 (1999).

[17] *CEE v. Dpto. de Estado*, supra, pág. 936.

ello, resolvimos que el recurso de revisión judicial no se tornaba académico por el hecho de que se hubiera culminado la construcción, ya que este era uno susceptible de repetición y que, además, tenía importantes consecuencias colaterales para el interés público en proteger los fondos del pueblo de Puerto Rico.[18]

Posteriormente, en *Perfect Cleaning v. Cardiovascular*, 172 DPR 139 (2007), resolvimos que un licitador a quien no se le adjudicó una subasta cuyo resultado es posteriormente revocado no tiene a su favor una causa de acción en daños y perjuicios contra la entidad gubernamental de que se trate. En este caso, varios licitadores participaron de una subasta para la contratación de servicios de limpieza realizada por el Centro Cardiovascular de Puerto Rico y el Caribe. La subasta fue adjudicada a favor de NBM Enterprises. Inconforme con la decisión, Perfect Cleaning presentó un recurso de revisión ante el Tribunal de Apelaciones alegando que NBM Enterprises no había cumplido con el pliego de especificaciones por lo que no se le debió conceder la buena pro. El Tribunal de Apelaciones revocó la adjudicación y ordenó la celebración de una nueva subasta. Amparándose en que el foro intermedio revocó la adjudicación de la subasta, Perfect Cleaning demandó al Centro Cardiovascular y a su Junta de subastas reclamando daños y perjuicios. Alegó que la subasta fue adjudicada

---

[18] *RBR Construction, S.E. v. Autoridad de Carreteras y Transportación*, 149 DPR 836, 847 (1999).

ilegalmente a favor de NBM Enterprises y que la actuación le provocó daños, ya que entendía que fue el postor más bajo y cumplió con todas las exigencias. Perfect Cleaning fundamentó su causa de acción en el precedente establecido en *RBR Const., S.E. v. A.C.*, supra. Tras varios incidentes procesales expedimos el recurso de *certiorari*. Al analizar la normativa aplicable al caso, determinamos que lo resuelto en *RBR Const., S.E. v. A.C.*, supra, no era aplicable a esa controversia. Ello, pues en Perfect Cleaning "no hubo una anulación abusiva o arbitraria de la subasta realizada por el Centro Cardiovascular. Más bien, lo que ocurrió fue una adjudicación errónea que ni siquiera presenta indicios de arbitrariedad o abuso de derecho".[19] Asimismo, distinguimos ambos casos de la forma siguiente:

> El análisis anterior demuestra que, en efecto, el foro apelativo hizo una interpretación equivocada de la opinión emitida en *RBR Const., S.E. v. A.C.*, supra. Por un lado, obvió que la norma allí establecida surgió en el contexto de la anulación abusiva y arbitraria de una subasta válidamente celebrada y no de una mera adjudicación errónea. Por otro lado, desatendió las razones que nos movieron a reconocer una posible causa de acción en aquel escenario; a saber: la necesidad de evitar la competencia desleal que puede ocurrir al anularse una subasta después que se han abierto las licitaciones.

> Más aún, consideramos que el dictamen recurrido sentaría un peligroso precedente en cuanto apoya la disponibilidad automática de una causa de acción en daños y perjuicios a favor de todo licitador perdidoso en una subasta cuya adjudicación fuera posteriormente revocada. No

---

[19] *Perfect Cleaning v. Cardiovascular*, 172 DPR 139, 147 (2007).

podemos perder de vista que con cierta frecuencia los resultados de las subastas son revisados y alterados tanto por el Tribunal de Apelaciones como por este Foro, sin que eso haya generado nunca una causa de acción a favor de los licitadores que inicialmente no fueron favorecidos.

. . . . . . . .

Evidentemente, un resultado que conlleve la imposición de responsabilidad a una agencia por una mera adjudicación de subasta errónea, en ausencia de circunstancias extraordinarias como las que dieron lugar a la norma adoptada en *RBR Const., S.E. v. A.C.*, supra, sería contrario al interés público, al mejor manejo de los fondos del erario y a las pautas que regulan las subastas gubernamentales.[20]

## B. Revisión Judicial

Los tribunales apelativos están llamados a otorgar amplia deferencia a las decisiones de las agencias administrativas por la experiencia y pericia que se presume tienen esos organismos para atender y resolver los asuntos que le han sido delegados.[21] No obstante, esa norma no es absoluta, por lo cual este Tribunal ha sido enfático en que no podemos imprimirle un sello de corrección, so pretexto de deferencia, a las determinaciones o interpretaciones administrativas irrazonables, ilegales o contrarias a derecho.[22]

---

[20] *Perfect Cleaning v. Cardiovascular*, supra, págs. 147-149.

[21] *Graciani Rodríguez v. Garage Isla Verde, LLC*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26 (2018); *Mun. de San Juan v. CRIM*, 178 DPR 163, 175 (2010); *Misión Ind. P.R. v. J.P.*, 146 DPR 64, 130 (1998).

[22] *Graciani Rodriguez v. Garage Isla Verde, LLC*, supra, pág. 127; *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 712, 746 (2012); *Empresas Ferrer v. A.R.Pe.*, 172 DPR 254, 264 (2007).

En *Torres Rivera v. Policía de Puerto Rico*, 196 DPR 606, 628 (2016), resumimos las normas básicas en torno al alcance de la revisión judicial de la forma siguiente:

> [L]os tribunales deben deferencia a las decisiones de una agencia administrativa, pero tal deferencia cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que **si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos procede que se valide la interpretación que realizó la agencia administrativa recurrida**. (Énfasis suplido).

Así, el criterio de razonabilidad es el que impera al revisar las determinaciones e interpretaciones de una agencia administrativa.[23] Es decir, el tribunal debe dirimir si la agencia actuó arbitraria o ilegalmente, o en forma tan irrazonable que su actuación constituya un abuso de discreción.[24]

Por otro lado, la sección 4.5 de la Ley Núm. 38-2017, según enmendada, conocida como la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU), establece que las determinaciones de hechos de las

---

[23] *Graciani Rodriguez v. Garage Isla Verde, LLC*, supra, pág. 127; *Torres Rivera v. Policía de PR*, 196 DPR 606, 626 (2016); *Empresas Loyola v. Com. Ciudadanos*, 186 DPR 1033, 1042-1043 (2012); *Calderón Otero v. C.F.S.E.*, 181 DPR 386, 396 (2011); *Rebollo v. Yiyi Motors*, 161 DPR 69, 77-78 (2004).

[24] *Graciani Rodriguez v. Garage Isla Verde, LLC*, supra, pág. 127; *Rolón Martínez v. Supte. Policía*, supra, pág. 35; *Rebollo v. Yiyi Motors*, supra.

decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo.[25] En cambio, las conclusiones de derecho serán revisadas en todos sus aspectos por el tribunal.[26] A su vez, el foro judicial examinará en toda su extensión aquellas cuestiones mixtas de hechos y de derecho cuando en el texto de la decisión final de la agencia se expone el derecho y se aplica a los hechos probados.[27]

### C. La subasta pública formal

El proceso de contratación de servicios por las agencias del gobierno está revestido del más alto interés público, pues busca promover la **inversión adecuada, responsable y eficiente de los recursos del Estado.**[28] Por otro lado, la subasta formal es el vehículo procesal ordinariamente utilizado por el Estado en la adquisición de bienes y servicios.[29] **Su objetivo principal es brindarle protección al erario mediante el acceso a la construcción de obras públicas y la adquisición de servicios de calidad para el Gobierno al mejor precio posible.**[30] Por tanto, la subasta gubernamental procura

---

[25] 3 LPRA sec. 9675.

[26] Íd.

[27] *Rivera v. A&C Development Corp.*, 144 DPR 450, 461 (1997).

[28] *ECA General Contractors, Inc. v. Municipio*, 200 DPR 665, 672 (2018). Véase, además, *Aut. Carreteras v. CD Builders, Inc.*, 177 DPR 398, 404 (2009).

[29] *ECA General Contractors, Inc. v. Municipio*, supra, pág. 672. Véase, además, *R & B Power v. E.L.A.*, 170 DPR 606, 620 (2007).

[30] *ECA General Contractors, Inc. v. Municipio*, supra, pág. 672. Véase, además, *RBR Const., S.E. v. A.C.*, supra, págs. 848-849.

establecer un esquema que asegure la competencia equitativa entre los licitadores, evite la corrupción y minimice los riesgos de incumplimiento.[31]

Actualmente, nuestro ordenamiento jurídico no contiene un estatuto uniforme que regule la subasta gubernamental dirigida a la adquisición de bienes y servicios.[32] Por consiguiente, corresponde a cada agencia ejercer su poder de reglamentación para establecer las normas que habrán de regir sus procedimientos de subasta.[33]

## D. Ley para la Inversión de la Industria Puertorriqueña

La Ley Núm. 14-2004 se creó, en lo pertinente, para establecer la política pública en lo relativo a las compras gubernamentales de bienes y servicios. La Asamblea Legislativa entendió necesario aprobar esta legislación, como un avance en la dirección de catapultar el crecimiento y el fortalecimiento de los productores locales, mediante una nueva política pública y nuevas estructuras.[34] Antes de la creación de esta ley, en el 1989 se creó la Ley Núm. 42, conocida como *Ley de Política Preferencial en las Compras Gubernamentales*, como un

---

[31] *ECA General Contractors, Inc. v. Municipio*, supra, págs. 672-673, citando a *Aut. Carreteras v. CD Builders, Inc.*, supra, pág. 404. Véase *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 DPR 864 (1990); *Justiniano v. E.L.A.*, 100 DPR 334 (1971).

[32] *ECA General Contractors, Inc. v. Municipio*, supra, pág. 673. Véase *RBR Constr., S.E. v. A.C.*, supra, pág. 850.

[33] *ECA General Contractors, Inc. v. Municipio*, supra, pág. 673. Véase *Aut. Carreteras v. CD Builders, Inc.*, supra, pág. 404.

[34] Exposición de motivos, de la Ley para la Inversión de la Industria Puertorriqueña, Ley Núm. 14-2004 (2004 Leyes de Puerto Rico 14).

mecanismo para que los productores locales pudiesen tener una participación efectiva en el mercado de compras del gobierno y estimular la creación de empleos y la inversión local.[35] No obstante, la Asamblea Legislativa aseguró que "después de trece años de vigencia de esta Ley, […] [era] muy poco lo que la misma ha[bía] logrado en términos de sus objetivos originales".[36] Añadieron, además, que "la poca participación de los productores locales en el mercado de compras gubernamentales, […] [era] un indicador de la ineficacia de la […] [entonces] 'Ley de Política Preferencial'".[37] Sobre este particular, la Asamblea Legislativa expresó

> […]que la industria local no est[aba] teniendo una participación óptima en este importante mercado, por diversas razones, entre las que se destaca[ba]: la falta de voluntad por parte de los oficiales públicos al momento de comprar bienes y servicios; el alto grado de burocracia en los procesos de subastas; la falta de poder y recursos de la actual Junta de Preferencia, adscrita a la Administración de Servicios Generales; y la poca fiscalización de la Compañía de Fomento Industrial, entidad que viene obligada a ayudar al productor puertorriqueño.[38]

En el primer informe que redactó la Comisión de Gobierno sobre el Proyecto de la Cámara 3238, entiéndase la Ley Núm. 14-2004, *supra*, se expresó que ese proyecto tenía el propósito de proteger a las industrias establecidas en Puerto Rico, particularmente las medianas

---

[35] Íd.

[36] Íd.

[37] Íd.

[38] Íd.

y pequeñas, de la competencia externa desleal que obstaculiza su capacidad para desarrollarse.[39] Además, aseguraron que "el gobierno entiende que estas industrias necesitan lograr un mayor volumen de ventas para ser competitivas".[40] Sobre este particular, la Comisión señaló lo siguiente:

> A las pequeñas y medianas empresas se les hace difícil lograr escalas eficientes de producción, debido a sus limitadas tasas de participación en los mercados. Esta condición desigual de competencias impide que estas empresas logren expandirse, generar más empleos y alcanzar mayores niveles de actividad económica. Es aquí donde los gobiernos intervienen tomando medidas para protegerlas.[41]

El Artículo 3 de la Ley Núm. 14-2004 dispone lo siguiente:

> Será política pública del Estado Libre Asociado de Puerto Rico, respaldar el crecimiento, desarrollo y fortalecimiento de la industria puertorriqueña, **mediante todos los mecanismos disponibles y viables dentro de los parámetros constitucionales, gubernamentales y económicos disponibles**, en aras de lograr la máxima creación de empleos para el país. Serán objetivos de esta Ley, entre otros, los siguientes:
>
> (a) Garantizar la mayor participación posible de los productores puertorriqueños de bienes y servicios en las compras gubernamentales de bienes y servicios, para apoyar la formación y expansión de empresas de capital local y empresas cooperativas, inducir la creación de

---

[39] Informe positivo sobre el P. de la C. 3238, Com. de Gobierno, Cámara de Representantes, 9 de abril de 2003, 5ta Ses. Ord., 14ma Asam. Leg., en la pág. 1.

[40] Íd.

[41] Informe positivo sobre el P. de la C. 3238, Com. de Gobierno, Cámara de Representantes, 9 de abril de 2003, 5ta Ses. Ord., 14ma Asam. Leg., *supra*, en la pág. 2.

más y mejores empleos, y lograr el desarrollo económico de Puerto Rico.

(b) Proveer las estructuras y los mecanismos necesarios para que una mayor cantidad de productores locales puedan accesar el mercado de compras del Gobierno, ya sea mediante subasta formal, informal, mercado abierto, contrato o procedimiento especial.

(c) Provocar niveles de eficiencia aceptables en los procedimientos de compras identificando aquellos productos, producidos localmente, cuyo rendimiento en términos de calidad y generación de empleos para el país sea mayor, logrando el desarrollo de industrias estratégicas, para el beneficio a corto, mediano y largo plazo de la economía puertorriqueña. (Énfasis y subrayado suplido).[42]

Por otro lado, el Artículo 7 de la referida ley regula la política preferencial para las compras del Gobierno de Puerto Rico. En lo pertinente, el artículo estatuye lo siguiente:

En toda compra de artículos o servicios que efectúe el Gobierno de Puerto Rico, se adquirirán los referidos servicios o artículos extraídos, producidos o manufacturados, ensamblados o envasados en Puerto Rico, o distribuidos por agentes establecidos en Puerto Rico, o de servicios rendidos en Puerto Rico, siempre que dichos artículos y servicios cumplan con las especificaciones, términos y condiciones establecidas en el pliego de subasta u orden de compra, y que su precio, **luego de aplicado el parámetro de inversión correspondiente, sea el más bajo o brinde las condiciones de calidad, entrega y disponibilidad de los bienes o servicios.** (Énfasis suplido).[43]

**E. Reglamento General para Promover la Política de Preferencia en las Compras del Gobierno**

---

[42] 3 LPRA sec. 930(nota).

[43] 3 LPRA sec. 930c.

El *Reglamento general para promover la política de preferencia en las compras de gobierno* MO-DNE-013, Reglamento Núm. 8488 de 17 de junio de 2014 (Reglamento Núm. 8488), "recoge las estipulaciones contenidas en la Ley [Núm. 14-2004], y sus subsiguientes enmiendas y adopta mecanismos ágiles que permiten dar un servicio a la par con la tecnología disponible".[44]

En cuanto a la política preferencial, el Artículo IX del Reglamento Núm. 8488 dispone lo siguiente:

> En toda compra que efectúen las Agencias tendrá un trato preferencial para los servicios o artículos extraídos, producidos o manufacturados, ensamblados o envasados en Puerto Rico, o distribuidos por agentes establecidos en Puerto Rico, **cuyas empresas tengan operaciones sustanciales en Puerto Rico, siempre y cuando estos servicios o artículos cumplan con las especificaciones, términos y condiciones del proceso de compra establecido por la Agencia y que, luego de aplicado el parámetro de inversión, <u>la oferta sea la más baja</u>** y ofrezca las condiciones de calidad, entrega y disponibilidad de los artículos o servicios requeridos. Las compras del Gobierno deberán ser planificadas. Los funcionarios gubernamentales no deberán favorecer una marca de su gusto particular. **<u>Las compras del Gobierno deben atender en primer orden los aspectos contenidos en la Ley</u>, seguido por el valor que refleje menor costo para la Agencia,** parámetros de calidad que estén claramente justificados y finalmente experiencias con el suplidor cuando medien mecanismos para medir los mismos evitando la arbitrariedad y el trato discriminatorio. (Énfasis y subrayado suplido).

---

[44] Exposición de motivos, Reglamento General para Promover la Política de Preferencia en las Compras de Gobierno MO-DNE-013, Reglamento Núm. 8488 de 17 de junio de 2014.

Por otro lado, en lo relativo al uso del por ciento de preferencia, el inciso (G) del Artículo IX del Reglamento Núm. 8488 dispone que:

1. La persona natural o jurídica que obtenga un porciento de preferencia para un producto, presentará la Resolución aprobada por la Junta o Certificación del Secretario(a) Ejecutivo(a) (a) acompañada de los pliegos de licitación o documentos relacionados a su participación en el proceso de compra de la agencia. Esta última deberá reconocerle el porciento de preferencia asignado […].

2. Las empresas s[o]lo pueden obtener el porciento de preferencia otorgado por la Junta para un mismo producto en una sola de las categorías por tipo de operación para las que [e]ste es concedido, entiéndase manufactura, ensamblaje, envasado o distribución así como servicio no profesional. Si una empresa tiene un porciento concedido por manufactura para algunos productos y otro porciento de preferencia por distribución para otros productos, no podrá sumar los porcientos al momento de reclamar su preferencia en su participación en el proceso de compra de la Agencia.

Por otro lado, en cuanto a la aplicación del por ciento de preferencia el inciso (I) del Artículo IX del Reglamento Núm. 8488 dispone como sigue:

En toda compra de una Agencia se adquirirán preferiblemente, los artículos producidos, manufacturados, ensamblados o envasados en Puerto Rico, así como los distribuidos por agentes establecidos en Puerto Rico. Se dará igual trato a los servicios no profesionales ofrecidos por empresas con operaciones sustanciales en Puerto Rico. Estos deberán cumplir con las especificaciones, términos y condiciones establecidos en el proceso de compra.

Para la adjudicación de las compras, la Agencia y sus representantes autorizados **aplicarán el porciento de preferencia para el artículo,** según la Resolución otorgada por la

Junta **y restará a lo cotizado la cantidad que resulte al calcular tal porciento del precio cotizado, <u>previo a determinar el postor más bajo</u>. Si una vez realizado este ejercicio, la empresa que posea la Resolución resulta con el precio o valor más bajo, se le adjudicará a [e]sta la compra o subasta. <u>El precio a pagar será el licitado antes de aplicar la preferencia</u>**.

Fórmula

P Cotizado – ((P Cotizado) (% de Preferencia)) = Precio a Considerar para la Adjudicación

**Lo anterior no alterará los criterios de cumplimiento que exijan las Agencias y Juntas de Subastas en cuanto a los requisitos, especificaciones, términos y condiciones. Sin embargo[,] <u>la Junta velará porque los organismos públicos no eludan o circunvalen el mandato de la Ley y este Reglamento</u>, mediante tecnicismos o especificaciones que no representan elementos esenciales del producto o el servicio que es objeto de compra por el Gobierno.** (Énfasis y subrayado suplido).

F.   **Reglamento de Compras y Subastas de la Autoridad para el Financiamiento de la Infraestructura**

El *Reglamento de compras y subastas*, Reglamento Núm. 5853 de 9 de septiembre de 1998 (Reglamento Núm. 5853), regula los procedimientos de subasta llevados a cabo por la Autoridad para el Financiamiento de la Infraestructura (AFI). En su Artículo I expresa la intención del Reglamento de la forma siguiente:

1.4 Intención. Puesto que los propósitos de la Autoridad incluyen proveer ayuda a un sinnúmero de corporaciones públicas e instrumentalidades del Gobierno de Puerto Rico, incluyendo ayuda en la implantación de muchos tipos de proyectos diferentes; y reconociendo que es necesario que la Autoridad cuente con métodos eficaces para implantar proyectos de infraestructura que sirvan intereses públicos críticos, es la

intención de este reglamento proveer procedimientos flexibles que permitan a la Autoridad hacer uso del alcance total de sus poderes legales con respecto a la obtención o compra de trabajo, servicios no personales, propiedad mueble y otros artículos, según se dispone en el presente documento. Por consiguiente, siendo este reglamento necesario para proteger y preservar la salud y el bienestar del pueblo de Puerto Rico, **el mismo deberá interpretarse libremente de manera que se respeten tales propósitos e intenciones**. (Énfasis suplido).

Por otro lado, en cuanto a la adjudicación al licitador más bajo, el Artículo 4 del Reglamento 5853 dispone que:

4.4 Adjudicación al Licitador Más Bajo. Salvo (a) los procedimientos de selección realizados de conformidad con el Artículo 6 ó el Artículo 7, y (b) las compras descritas en la Sección 4.2 precedente, los contratos otorgados por la Autoridad para realizar cualquier obra pública como instalaciones de infraestructura o para la compra de propiedad mueble o servicios no personales, así como el arrendamiento de cualquier propiedad se adjudicarán al **licitador más bajo que satisfaga los requisitos y las condiciones establecidos en los Documentos de Subasta y en este reglamento.**(Énfasis suplido).

En cuanto a los criterios de evaluación que AFI debe tomar en consideración, el Artículo 2 del referido reglamento aclara que:

Criterios de Evaluación – significa los criterios indicados en la Solicitud de Propuestas o Solicitud de Documentos de Calificación que la Junta o el Comité de Evaluación utilizan para evaluar, clasificar y recomendar el rechazo o la adjudicación de los Documentos de Calificaciones o propuestas, y que la Autoridad utiliza para evaluar las propuestas para determinar si rechazarlas o adjudicarlas.

Ahora bien, en cuanto al proceso de evaluación de propuestas establece, en lo pertinente, que:

[6.6.1](d) Las propuestas se evaluarán a la luz de los Criterios de Evaluación. La Junta, con la Ayuda del Comité de Evaluación, podrá seleccionar una o más de las propuestas que considere que mejor sirve(n) los intereses de la Autoridad. Cuando se reciba o seleccione una sola propuesta, la Junta, con la ayuda del Comité de Evaluación, seguirá los procedimientos descritos en la Subsección 6.6.6, a continuación. En todo caso, la Junta y el Comité de Evaluación evaluarán las propuestas a base de los Criterios de Evaluación para determinar cuáles propuestas están dentro del margen competitivo. Una vez hecha esta determinación, y a discreción del Director, la Junta y el Comité de Evaluación completarán sus evaluaciones y harán sus recomendaciones a base de las propuestas sometidas, conforme se indica en el párrafo 6.6.2(g), a continuación, o la Junta o el Comité de Evaluación **sostendrán discusiones y negociarán con los licitadores cuyas propuestas estén dentro del margen competitivo**, conforme se indica en la Subsección 6.6.2, a continuación, antes de dar por concluida su evaluación.

[…]

[6.6.].4 **Sujeto al derecho de la Autoridad de rechazar cualquier propuesta, se seleccionará la propuesta que se considere más ventajosa para la Autoridad, considerando el precio y otros Criterios de Evaluación; disponiéndose que la Autoridad podrá optar por seleccionar la propuesta que ofrezca el precio más bajo, <u>siempre y cuando la Solicitud de Propuestas notifique a todos los proponentes que la selección final entre los proponentes que estén dentro del margen competitivo se basará solamente en el precio</u>**.

[6.6.].5 Una vez la Autoridad reciba las propuestas revisadas, **podrán llevarse a cabo discusiones o negociaciones adicionales**, siempre y cuando el Director determine que dichas discusiones o negociaciones adicionales sirven los mejores intereses de la Autoridad. En tal caso, **la Autoridad podrá solicitar que**

**se vuelvan a someter propuestas**. (Énfasis y subrayado suplido).

III

En primer lugar, es menester atender el asunto traído por la parte recurrida sobre la academicidad de la controversia ante nuestra consideración. Específicamente, AFI sostuvo que la obra ya había sido completada, por lo cual, a su entender, el remedio solicitado por la parte peticionaria, entiéndase, que se le adjudique la subasta, sería contrario a la política pública del Gobierno e imposible de hacer cumplir. A esos efectos, Super Asphalt apoyó su causa de acción en lo resuelto por este Tribunal en *RBR Const., S.E. v. A.C.*, supra.

Al considerar, la controversia medular en este caso, es decir, si AFI abusó de su discreción o actuó arbitrariamente al adjudicar la subasta a A&M Group, entendemos que esta no se ha tornado académica por el hecho de que se haya finalizado la obra objeto de la impugnación. La cuestión planteada en este caso es una susceptible de repetición, pues trata de un asunto, el parámetro de preferencia, que continuamente va a ser invocado en los procesos de subasta. A su vez, como ya hemos resuelto en estos casos, la adjudicación de la subasta no es el único remedio al cual la parte peticionaria podría tener derecho. Ello, pues se ha reconocido otro remedio, una acción en daños, de probarse que la agencia **abusó de su discreción o actuó de forma**

**arbitraria** en el proceso de la adjudicación de la subasta.[45] Así, superado el planteamiento de academicidad, pasemos entonces a evaluar los méritos de la controversia.

Cuando se realizó el proceso inicial de licitación y análisis de las propuestas para la adjudicación del proyecto AFI-BP-18-18, la parte recurrida recibió cuatro propuestas de licitadores, de las cuales dos se beneficiaron del parámetro de preferencia dispuesto en la Ley Núm. 14-2004. A su vez, uno de esos licitadores fue Super Asphalt. No obstante, aun después de haberse aplicado el parámetro de preferencia, los cuatro licitadores se excedieron del presupuesto disponible para el referido proyecto, por lo cual se canceló la subasta.

Sin embargo, la Junta de Subastas autorizó una negociación con los dos licitadores cuyas propuestas resultaron ser las más bajas, tomándose en consideración el parámetro de preferencia.[46] Estos licitadores fueron A&M Group y Super Asphalt. Como mencionamos, esta segunda etapa se realizó bajo el concepto de "Best and Final Offer" e incluso se hizo una rebaja a ambos licitadores de $70,000 para "facilitar la viabilidad del proyecto a licitarse".[47]

Ahora bien, Super Asphalt sostiene que además había que aplicarle el diez por ciento de preferencia a su oferta, según dispone el Reglamento Núm. 8488. Al hacer

---

[45] Véase *RBR Const., S.E. v. A.C.*, supra.

[46] Apéndice de la Petición de *certiorari*, pág. 77.

[47] Íd.

este ejercicio, ciertamente Super Asphalt hubiese resultado ser el licitador con la propuesta más baja por $748,174.86 versus la propuesta de A&M Group de $779,285. No obstante, el propio Reglamento Núm. 8488 especifica que al realizar este ejercicio, si el licitador que posea el parámetro de preferencia resulta con la propuesta más baja **"[e]l precio a pagar será el licitado antes de aplicar la preferencia"**. (Énfasis suplido). Por lo tanto, de habérsele adjudicado la subasta a Super Asphalt, AFI hubiese tenido que pagar los $831,305.40, es decir, la cantidad ofertada antes de aplicar el por ciento de preferencia. De la *Solicitud de Subasta o Relevo* que forma parte del expediente del Tribunal de Apelaciones surge que el presupuesto para el proyecto era de $787,367.62.[48] Por lo tanto, la cantidad que se le hubiese tenido que pagar a la parte peticionaria se excedía de la suma presupuestada por la agencia. En particular, esta última hubiera tenido que pagar $39,192.76 en exceso de la cuantía presupuestada para el proyecto. Es por eso que AFI determinó adjudicar la subasta a A&M Group, único licitador dentro de los parámetros presupuestados.

Si bien es cierto que el propósito de la Ley Núm. 14-2004 es promover el desarrollo y fortalecimiento de la industria puertorriqueña y que los productores locales puedan tener una participación efectiva en el mercado de compras del Gobierno **sus efectos no pueden ser en**

---

[48] Apéndice del Alegato presentado por la parte recurrida ante el Tribunal de Apelaciones, pág. 3.

**detrimento al erario ni contrarios al interés público**. Ese razonamiento está apoyado en el Art. 3 de la Ley Núm. 14-2004 que especifica que para adelantar esa política pública se utilizarán "todos los mecanismos dentro de los parámetros constitucionales, gubernamentales y **económicos disponibles**". (Énfasis suplido). Además, coincidimos con la apreciación del foro apelativo intermedio en cuanto a que ni la Ley Núm. 14-2004 ni el Reglamento Núm. 8488 contienen una disposición que obligue a las agencias a adjudicar subastas por cantidades mayores a las presupuestadas para cumplir con el parámetro de preferencia. De lo contrario, AFI hubiese estado obligado a adjudicarle la subasta a Super Asphalt desde el primer proceso que se realizó, ya que en aquella también resultó ser el licitador con la propuesta más baja tras aplicársele el parámetro de preferencia. No obstante, debido a que tanto los dos licitadores que se beneficiaron del porciento de preferencia como los otros dos se excedieron del presupuesto asignado para el proyecto, la subasta fue cancelada. Es por eso que entendemos que la determinación de AFI en cuanto a adjudicar la segunda subasta a A&M Group, dado a que el precio a pagar por los servicios se encontraba dentro del presupuesto, no fue arbitraria o irrazonable.

Así pues, resolvemos que no procede adjudicar la buena pro a un licitador que excede el presupuesto asignado de un proyecto, aun cuando luego de aplicar el

parámetro de preferencia la subasta lo ubica dentro de la propuesta presuntamente más baja. En ese caso lo que corresponde es adjudicar la buena pro al licitador con el precio más bajo y, que a su vez, cumpla con una propuesta dentro de los parámetros presupuestarios disponibles. Por lo tanto, es forzoso validar la determinación a favor de la parte recurrida.

## IV

Por los fundamentos que anteceden, se confirma el dictamen del Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.


Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Super Asphalt Pavement, Corp.<br><br>Peticionario<br><br>v.<br><br>Autoridad para el Financiamiento de la Infraestructura de Puerto Rico<br><br>Recurrido<br><br>A&M Group, Inc.<br><br>Recurrido | CC-2019-0130 | |

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de marzo de 2021.

Por los fundamentos antes expuestos, resolvemos que no procede adjudicar la buena pro a un licitador que excede el presupuesto asignado de un proyecto, aun cuando luego de aplicar el parámetro de preferencia la subasta lo ubica dentro de la propuesta presuntamente más baja. En ese caso lo que corresponde es adjudicar la buena pro al licitador con el precio más bajo y, que a su vez, cumpla con una propuesta dentro de los parámetros presupuestarios disponibles. Por lo tanto, es forzoso validar la determinación a favor de la parte recurrida. En consecuencia, se confirma el dictamen del Tribunal de Apelaciones

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emite una Opinión disidente a la cual se une la Jueza Presidenta Oronoz Rodríguez. Los Jueces Asociados señores Kolthoff Caraballo y Colón Pérez no intervinieron.


José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Super Asphalt Pavement, Corp.<br><br>Peticionaria<br><br>v.<br><br>Autoridad para el Financiamiento de la Infraestructura de Puerto Rico<br><br>Recurrida<br><br>A & M Group, Inc.<br><br>Recurrido | CC-2019-0130 |

Opinión disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES a la cual se une la Jueza Presidenta ORONOZ RODRÍGUEZ.

En San Juan, Puerto Rico, a 30 de marzo de 2021.

Disiento respetuosamente por entender que la controversia se tornó académica. En este caso, Super Asphalt Pavement, Corp. (Super Asphalt) sostiene que la Junta de Subastas de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (AFI) erró al no aplicarle el porciento de preferencia que dispone la Ley Núm. 14-2004, infra y el Reglamento Núm. 8448, infra. Así, a pesar de que el proyecto ya se completó, Super Asphalt solicita que revoquemos la sentencia del Tribunal de Apelaciones y devolvamos el caso a la AFI para que determine si adjudicará al mejor postor, si continuará con las negociaciones, si determinará que se cancele la subasta o cualquier otra cosa que en derecho proceda. Entiendo que, independientemente de los méritos o deméritos de la controversia, Super Asphalt no tendrá derecho a remedio

alguno y, por lo tanto, nuestra sentencia no tendrá consecuencia práctica alguna.

I

El trasfondo fáctico y procesal de la controversia está adecuadamente reseñado en la Opinión del Tribunal. En resumen, en junio de 2018 la AFI convocó una subasta para la repavimentación de las carreteras PR-35 y PR-3334 del Municipio de Yauco. La Junta de Subastas de la AFI evaluó las ofertas, pero resultó que todos los participantes se excedieron del presupuesto disponible de $787,367.62. Por tanto, el 10 de agosto de 2018, se notificó la cancelación del proceso de subasta.

Sin embargo, la Junta de Subastas autorizó negociar con los dos licitadores que sometieron las propuestas más bajas. Estos fueron A&M Group, Inc. (A&M Group) y Super Asphalt. La Junta adjudicó la subasta a A&M Group. Expresó que la oferta de A&M Group fue la menor y estaba dentro de los parámetros del presupuesto asignado.

Inconforme, Super Asphalt presentó una moción de reconsideración. Expresó que la Junta no tomó en consideración el 10% de preferencia que otorga la Junta de Inversión en la Industria Puertorriqueña (JIIP). Planteó que, de habérsele otorgado ese por ciento de preferencia, Super Asphalt hubiese resultado con el precio más bajo. La AFI declaró "no ha lugar" la solicitud de reconsideración ya que, según explicó, a pesar de la aplicabilidad del porciento de preferencia, su precio contractual y el cual

la AFI estaría obligado a desembolsar resultaba mayor al presupuesto asignado y disponible. Véase, Ap. Sol. Cert., págs. 77-78. Añadió que según el Reglamento Núm. 8448, infra, la agencia está obligada a pagar el precio licitado antes de aplicar la preferencia.

Insatisfecho, la peticionaria Super Asphalt presentó un recurso de revisión judicial ante el Tribunal de Apelaciones. Ese foro confirmó la determinación de la agencia. El tribunal concluyó que la propuesta presentada por Super Asphalt de $831,305.40, aun aplicado el por ciento de preferencia al determinar el postor más bajo, no habría resultado en una propuesta dentro del presupuesto disponible. Además, determinó que no hay nada en la Ley para la inversión de la industria puertorriqueña, Ley Núm. 14-2004, 3 LPRA 930 et seq. (Ley Núm. 14-2004) ni en el Reglamento general para promover la política de preferencia en las compras del Gobierno, Reglamento Núm. 8488 de 17 de junio de 2014 (Reglamento Núm. 8488) que obligue a la agencia o corporación pública a adjudicar un contrato por una cantidad que no esté disponible o no esté presupuestada.

Inconforme, Super Asphalt presentó este recurso de certiorari. Sostiene que la AFI debió tomar en consideración el parámetro de preferencia otorgado por virtud de la Ley Núm. 14-2004. Por su parte, A&M **alegó que la controversia es académica, ya que al 31 de marzo de 2019 se habían pagado $689,285.00, que corresponden al noventa**

**por ciento de la obra, la cual fue reportada como completada**, y solamente quedan pendientes unos trabajos de repavimentación.

II

Un pleito inicialmente justiciable deja de serlo cuando "los cambios fácticos o judiciales acaecidos durante el trámite judicial de una controversia, tornan en académica o ficticia su solución". Com. de la Mujer v. Srio. de Justicia, 109 DPR 715, 724-725 (1980). Al considerar la academicidad es esencial evaluar la relación entre los eventos pasados que dieron inicio al pleito y la adversidad presente. Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 933 (2011).

Un caso se convierte en académico cuando "la cuestión en controversia pierde eficacia ante el paso del tiempo, ya sea porque ocurrieron cambios en los hechos o en el derecho, y la misma se vuelve inexistente". Pueblo v. Diaz Alicea, 2020 TSPR 56, 204 DPR ___ (2020). Una vez se determina que el caso es académico, los tribunales deben abstenerse de considerarlo.

Sin embargo, se han elaborado una serie de excepciones que permiten al tribunal considerar un caso académico. Esto es cuando: (1) se plantea ante el foro judicial una **cuestión recurrente o susceptible de volver a ocurrir y que tienda a evadir la revisión judicial**; (2) la situación de hechos ha sido modificada por el demandado, pero el cambio no aparenta ser permanente, y (3) se tornan académicos

aspectos de la controversia, pero **subsisten consecuencias colaterales vigentes**. Pueblo v. Diaz Alicea, supra, pág. 5; Bhatia Gautier v. Gobernador, 199 DPR 59, 73-74 (2017).

Para determinar si se configura la excepción de recurrencia deben considerarse los factores siguientes: (1) la probabilidad de recurrencia de la controversia; (2) la identidad de las partes involucradas en el procedimiento y (3) la probabilidad de que el asunto eluda revisión judicial. PNP v. Carrasquillo, 166 DPR 70, 76 (2005). En cuanto al primer factor se requiere una "probabilidad razonable" de que la controversia pueda repetirse. Íd. En cuanto al tercer factor, lo determinante es que sea "inherentemente de tan corta duración que sea probable que la controversia siempre se torne académica antes de que la litigación se complete". (cita omitida) Íd. Es decir, el asunto debe ser de tan corta duración que evada su adjudicación o revisión. Asoc. de Periodistas v. González, 127 DPR 704, 721 (1991). Esta excepción intenta delimitar aquellas situaciones en que la controversia "se ha tornado académica debido a circunstancias de tiempo íntimamente relacionadas con su naturaleza, por lo que es razonable pensar que, de surgir la misma controversia en el futuro, nuevamente se tornará académica antes de que el tribunal la adjudique". J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 186. El caso que tenemos ante nuestra consideración no es uno de los que

sea capaz de evadir revisión judicial si vuelve a repetirse.

La Opinión del Tribunal plantea que la controversia no se ha tornado académica por el hecho de que se haya finalizado la obra objeto de la impugnación, pues la cuestión planteada en este caso es susceptible de repetición. Sin embargo, en ningún momento discute los factores para que se cumpla con la excepción de recurrencia. Este caso presenta una situación extraordinaria en la que, a pesar de la aplicabilidad del porciento de preferencia, el precio contratado y que la agencia estaría obligada a desembolsar, resulta mayor al presupuesto asignado y disponible. Además, como expliqué, no basta con que la controversia sea capaz de repetirse sino que, además, debe evadir la revisión judicial.

Otro asunto que la Opinión del Tribunal invoca para descartar la academicidad de la controversia es que la adjudicación de la subasta no es el único remedio al cual la parte peticionaria podría tener derecho. Como mencioné, otra de las excepciones que reconoce la doctrina es si persisten consecuencias colaterales a la controversia principal, que todavía tienen vigencia y actualidad. C.E.E. v. Depto. de Estado, 134 DPR 927, 937 (1993). Estos casos no se convierten en académicos porque existen consecuencias ulteriores que dependen de la adjudicación en los méritos. Gobernador v. Alcalde de Coamo, 131 DPR 614 (1992).

Al respecto en RBR Cons., S.E. v. A.C., 149 DPR 836 (1999), resolvimos que la adjudicación del proyecto no era el único remedio al cual el licitador perdidoso en ese caso podría tener derecho. En ese caso, RBR Construction S.E. (RBR) compareció junto a otros licitadores a una subasta convocada por la Junta de la Autoridad de Carreteras y Transportación de Puerto Rico (Junta de la ACT). La Junta de ACT rechazó la licitación de RBR debido a un supuesto problema con su seguro de fianza. Inconforme, RBR solicitó la reconsideración de la determinación. Posteriormente, la Junta de la ACT **anuló la subasta sin expresar sus razones, celebró una nueva subasta y la adjudicó a un nuevo licitador.** Íd. págs. 843-845. Tras varios trámites procesales, RBR acudió al Tribunal de Circuito de Apelaciones. Este denegó el recurso ante sí por académico. Fundamentó su conclusión en que la segunda subasta se había celebrado y los trabajos del proyecto estaban avanzados. Íd. pág. 845.

Sin embargo, en esa ocasión revocamos al foro apelativo intermedio y resolvimos **que el recurso de revisión judicial no se tornaba académico ya que RBR no quedaría huérfano de remedio, pues podía recibir compensación por daños si la agencia abusó de su discreción.** Íd. pág. 847. En ese caso, dijimos que avalar la postura de que toda **subasta anulada ilegalmente** quedaría inmune a la revisión judicial con la mera celebración de una segunda subasta "podría equivaler a darle un cheque en

blanco al funcionario de gobierno para que continúe celebrando subastas hasta que el postor de su predilección obtenga la buena pro". Íd. pág. 848.

Sin embargo, casi una década después, Perfect Cleaning v. Cardiovascular, 172 DPR 139 (2007), nos dio la oportunidad de delimitar y aclarar esa norma. Allí resolvimos que un licitador a quien no se le adjudicó una subasta, cuyo resultado es posteriormente revocado, no tiene a su favor una causa de acción en daños y perjuicios contra la entidad gubernamental de que se trate.

En ese caso, el Centro Cardiovascular de Puerto Rico y el Caribe celebró una subasta a la que comparecieron varias entidades, entre ellas, Perfect Cleaning Service, Inc. (Perfect Cleaning) y NBM Enterprises. La subasta se adjudicó a favor de esta última. Íd. pág. 142.

Tras varios trámites, Perfect Cleaning presentó un recurso de revisión ante el Tribunal de Apelaciones, aduciendo que NBM Enterprises no había cumplido con el pliego de especificaciones y que, por lo tanto, no se le debió conceder la buena pro. El foro apelativo revocó la adjudicación de la subasta por entender que, en efecto, NBM Enterprises no cumplió con los requisitos aplicables. Íd. En vista de ello, se celebró una nueva subasta cuyo resultado también fue revocado en la etapa de revisión. En esa segunda ocasión, el Tribunal de Apelaciones ordenó expresamente la celebración de una nueva subasta. Amparándose en el dictamen del foro apelativo que revocó la

adjudicación hecha a favor de NBM Enterprises, Perfect Cleaning presentó una demanda sobre daños y perjuicios contra el Centro Cardiovascular y su Junta de Subastas. Sostuvo que la subasta fue ilegalmente adjudicada a favor de NBM Enterprises y que esa actuación le ocasionó daños, ya que, a su entender, fue el postor más bajo que cumplió con todas las exigencias. Íd.

En respuesta a la demanda, el Centro Cardiovascular presentó una moción de desestimación. Adujo que la demanda incoada por Perfect Cleaning dejaba de exponer una reclamación que ameritara la concesión de un remedio. Perfect Cleaning se opuso a la solicitud de desestimación, utilizando como fundamento la opinión emitida en RBR Const., S.E. v. A.C., supra. Argumentó que allí se reconoció una causa de acción en daños y perjuicios a favor de los licitadores perjudicados por la adjudicación ilegal de una subasta. Íd. págs. 142-43. Tras varios incidentes procesales, el Tribunal de Primera Instancia desestimó la demanda. Íd. pág. 143.

En esa ocasión, aunque todavía existía la probabilidad de que Perfect Cleaning pudiera resultar favorecido, estimamos necesario explicar que la imposición de responsabilidad a una agencia por "**una mera adjudicación de subasta errónea, en ausencia de circunstancias extraordinarias como las que dieron lugar a la norma adoptada en RBR Const., S.E. v. A.C., supra, sería contrario al interés público, al mejor manejo de los fondos**

**del erario y a las pautas que regulan las subastas gubernamentales**". Perfect Cleaning v. Cardiovascular, supra, pág. 148-49 (énfasis suplido). Sostuvimos que lo que ocurrió fue una adjudicación errónea, como cuestión de derecho, pero esta no presentó "indicios de arbitrariedad o abuso de derecho". Íd. pág. 147. Explicamos que el foro apelativo hizo una interpretación equivocada de la opinión emitida en RBR Const., S.E. v. A.C., supra, al obviar que la norma que se estableció en ese caso "surgió en el contexto de la anulación abusiva y arbitraria de una subasta válidamente celebrada y no de una mera adjudicación errónea". Perfect Cleaning v. Cardiovascular, supra, pág. 147. Añadimos que resolver lo contrario presentaría un precedente peligroso, en cuanto apoya la disponibilidad automática de una causa de acción en daños y perjuicios a favor de todo licitador perdidoso en una subasta cuya adjudicación fuera posteriormente revocada. Íd. pág. 148. Es decir "[n]o podemos perder de vista que con cierta frecuencia los resultados de las subastas son revisados y alterados por [los tribunales], sin que eso haya generado nunca una causa de acción a favor de los licitadores que inicialmente no fueron favorecidos". Íd.

Como vemos, el efecto que tuvo esta decisión fue descartar que existan consecuencias colaterales en estos casos, a no ser que se trate de una circunstancia extraordinaria como la que ocurrió en RBR Cons., S.E. v. A.C., supra. No cabe duda de que el caso que tenemos ante

nuestra consideración no presenta esa circunstancia extraordinaria. Según nuestro precedente en Perfect Cleaning v. Cardiovascular, supra, **la adjudicación errónea de una subasta no ofrece remedio al licitador perdidoso.** Siendo así, **en estos casos no existen consecuencias ulteriores que dependen de la adjudicación del caso en sus méritos.**

En este caso, AFI sostiene que la obra se completó por lo que el remedio solicitado por la parte peticionaria, es decir, que se le adjudique la subasta, es contrario a la política pública del Gobierno e imposible de hacer cumplir. Por otra parte, Super Asphalt apoyó su causa de acción en lo resuelto por este Tribunal en R.B.R. Const., S.E. y. A.C., supra, pues considera que la controversia medular en este caso es si AFI abusó de su discreción o actuó arbitrariamente al adjudicar la subasta a A&M Group. Como expliqué, la situación del caso de autos es totalmente distinguible a la que se presentó en R.B.R. Const., S.E. y. A.C, supra, y por lo tanto no aplica a los hechos de este caso. En R.B.R. Const., S.E. y. A.C., supra, la entidad gubernamental anuló una subasta sin exponer justificación alguna, de forma arbitraria e insuficiente. Esa anulación representó un abuso del derecho y un acto arbitrario plagado de irregularidades. Perfect Cleaning v. Cardiovascular, supra, pág. 145. Esos no son los hechos en este caso.

A simple vista, sin necesidad de entrar a los aspectos sustantivos de la controversia, vemos que la actuación de AFI no presenta indicios de arbitrariedad o abuso de derecho. Si algo, se trataría de una adjudicación errónea como cuestión de derecho, asunto por el cual no se reconoce una causa de acción en nuestro ordenamiento legal.

Por lo tanto, **independientemente de los méritos de la controversia, Super Asphalt no tendrá derecho a remedio alguno**, y por consiguiente nuestra Sentencia no tendrá consecuencia práctica alguna. En conclusión, el asunto no es uno que de repetirse sea de una naturaleza tal que evada su revisión ni subsisten consecuencias colaterales. Por lo tanto, es académico.

### III

Por estas razones, disiento respetuosamente de la decisión del Tribunal.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado